[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10856

_____

D.C. Docket No. 9:18-cv-80843-BER

MIDLEVELU, INC.,

Plaintiff-Appellee,

versus

ACI INFORMATION GROUP,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 3, 2021)

Before WILLIAM PRYOR, Chief Judge, JORDAN and MARCUS, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal involves a blog operator that sued a content aggregator for copyright infringement after the aggregator copied and published the blog's content. A jury sided with the blog operator. The main issue for us is whether the

district court should have allowed the jury to decide whether the aggregator had an implied license to copy and publish the blog's content. Although the district court employed a too narrow understanding of an implied license, we conclude that a jury could not have reasonably inferred that the blog impliedly granted the aggregator a license to copy and publish its content. The aggregator also argues that the district court erred when it instructed the jury about statutory damages, permitted the jury to consider ineligible works in awarding damages, failed to consult with the Register of Copyrights about the blog operator's alleged fraud on her office, and denied the aggregator's motion for judgment as a matter of law based on its defense of fair use. Because no reversible error occurred, we affirm.

## I. BACKGROUND

MidlevelU, Inc., formerly a limited liability company and currently doing business as ThriveAP, operates a website that provides resources for midlevel healthcare providers, such as nurse practitioners and physician assistants. Erin Tolbert, a nurse practitioner, founded MidlevelU in 2012. MidlevelU generates revenue through resources it offers, including various educational programs. It also publishes a free blog designed to attract potential customers to its revenue-generating resources.

MidlevelU makes the full text of its blog articles available in an RSS—or "really simple syndication"—feed. It has used the RSS feed since the blog's

inception to allow readers to easily read its articles. MidlevelU designed its blogging platform so that its RSS feed would distribute the full text of the blog instead of only headlines and summaries of recent articles. It also coded its website to instruct search engines that they may copy and archive every page on the site. MidlevelU included a copyright notice on its website and RSS feed, with a date range from 2012 to the present year, but it did not include a copyright notice for each article.

Newstex, LLC, doing business as ACI Information Group, is a wholesale aggregator of news publications. It primarily sells collections of licensed news content to companies. In 2013, it created the Scholarly Blog Index, a curated index of abstracts and full-text articles of academic blogs.

To create the Index, Newstex compiled a repository of bibliographic information for thousands of blogs. It copied into the repository full-text content from sources its news-aggregation business had licensed. It also subscribed to RSS feeds for thousands of blogs for which it did not have a license agreement to use full-text content. Through the RSS feeds, Newstex received new articles posted to the blogs. It ran the articles through software that generated summaries of the articles. The entries in the Index for these blog articles included bibliographic information about the author and the blog, the computer-generated summary of the article, and a link to the original post. Newstex also added a tab labeled "original"

to each entry, available only to subscribers. It embedded an "iFrame" in that tab so that clicking on the tab opened a window showing the original, fully browsable web page, including the full-text content of each article—a "live snapshot"—within the Index website.

It offered Index subscriptions to academic libraries, a few of which subscribed. From 2015 to 2017, Newstex subscribed to the MidlevelU blog's RSS feed and included its content in the Index. In 2018, Newstex discontinued the Index because it was not profitable.

In early 2017, Tolbert found that excerpts of her blog articles were appearing on the Index website. To fully access the Index, Tolbert paid for a personal subscription. She searched for "MidlevelU" within the Index, which turned up 823 entries. It upset her that MidlevelU's content appeared in the Index and that the computer-generated abstracts poorly represented its content. It also upset her that the use of iFrames kept readers on the Index website instead of directing them to MidlevelU's website where they could purchase MidlevelU's products.

Meanwhile, Tolbert registered the 50 most recent MidlevelU articles for copyright protection with the United States Copyright Office. MidlevelU often republished its own articles and deleted the original versions in the process. But Tolbert did not check to see if the articles she registered were republications.

On March 7, 2017, MidlevelU emailed Newstex a cease-and-desist letter demanding that it remove MidlevelU's content from the Index immediately. MidlevelU asserted that Newstex had posted "a lengthy portion," not merely "summaries," "abstracts," or "headlines," of more than 800 MidlevelU articles. And it complained that, for paying subscribers, Newstex posted a "snapshot" of each article. Newstex removed the content from the Index that same day. It also coded links to entries on the Index for MidlevelU articles so that they would now redirect to MidlevelU's website. On March 20, 2017, Newstex informed MidlevelU that the content had been removed.

A few months later, Tolbert again searched for MidlevelU's content online. Her search results revealed that although the content was no longer available on the Index website, entries for the content still appeared in website repositories of university libraries. These entries credited ACI as the source of the information. And at least one library also credited ACI as the content's publisher and directed visitors to view MidlevelU's full-text content in ACI's website—"[s]ubscribers only."

In June 2018, MidlevelU sued Newstex for copyright infringement. In response, Newstex asserted copyright-registration invalidity, implied license, and fair use as affirmative defenses. And it asserted two counterclaims seeking declaratory judgments against MidlevelU. Newstex asked the district court to

5

declare that MidlevelU was not entitled to statutory damages for 18 articles because they were registered more than three months after the original publication date. And it requested that the district court declare invalid the registrations of 16 of those articles on the ground that MidlevelU knew that the asserted publication dates for those articles were inaccurate when it applied for registration and so it committed fraud on the Copyright Office. MidlevelU elected to seek statutory damages, instead of actual damages, for all 50 registered articles at issue. 17 U.S.C. § 504.

Newstex moved *in limine* to bar MidlevelU from introducing evidence or presenting argument about MidlevelU's 773 unregistered articles on the Index. But during the final pretrial conference, Newstex conceded that evidence about the articles were admissible to provide context for the parties' history. The district court said it would allow the evidence, but it would instruct the jury that "there is no allegation in this case that anything other than the 50 articles that are at issue in this case were improperly utilized by Newstex." Later, the district court explained that evidence about these unregistered articles "goes to willfulness and potentially to statutory damages," and so it was admissible. Fed R. Evid. 404(b).

MidlevelU filed its own motion *in limine*. Because Newstex did not timely disclose him as an expert witness, the district court barred Christopher Moyer, Newstex's Chief Technology Officer, from testifying that it is widely understood

6

that websites distributing content through RSS feeds welcome others to redistribute that content. Moyer had made a statement to that effect in a sworn declaration in support of Newstex's motion for summary judgment based on its defense of implied license.

The district court held a four-day trial. MidlevelU asked the district court to remove two articles from the proposed verdict form; it conceded that those articles were ineligible for statutory damages because it did not timely register them. Newstex moved for judgment as a matter of law on several grounds: insufficient proof of copyright validity, that no statutory damages were available for articles that were untimely registered, its implied-license defense, and its fair-use defense. MidlevelU moved for judgment as a matter of law as to three of Newstex's affirmative defenses: fraud on the Copyright Office, fair use, and implied license. The district court granted MidlevelU's motion on implied license after considering two theories of the defense but denied the other motions.

In its jury charge, the district court explained that in determining the amount to award for a particular work, the jury could consider several factors. The district court reminded the jury that it heard testimony about approximately 800 articles, including articles other than those alleged to be infringed. It instructed the jury that it "may not award damages for any of those other works . . . [it] may only award damages for the works that . . . are the core of this case." "However," the district

7

court continued, the jury "may consider those other works and Newstex's conduct with regard to the other works in deciding the amount of damages for any infringement that [it] find[s]." Newstex had objected to this instruction during the charge conference. The district court overruled the objection because it understood that the unregistered articles could be considered "to establish willfulness" as "the factors [for consideration of] the statutory damages [include] the circumstances of the infringement[ and] the need to deter future infringement."

The jury found that MidlevelU proved it owned a valid registered copyright in 43 out of 48 articles. And it found that Newstex willfully infringed those 43 articles. The jury found that Newstex did not prove its fair-use defense or fraud on the Copyright Office for any articles. Interrogatory number four asked the jury if 16 articles were ineligible for statutory damages because MidlevelU untimely registered them. The jury said yes to all 16. It awarded $7,500 in statutory damages for each of the 27 eligible articles, for a total award of $202,500. Newstex renewed its motion for judgment as a matter of law and moved for a new trial or for remittitur, all of which the district court summarily denied.

## II. STANDARDS OF REVIEW

We review *de novo* a grant or denial of a judgment as a matter of law. *Thosteson v. United States*, 331 F.3d 1294, 1298 (11th Cir. 2003). "In considering the sufficiency of the evidence that supports the jury's verdict, we review the

evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." *Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999) (internal quotation marks omitted). But the nonmovant "must put forth more than a mere scintilla of evidence suggesting that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Thosteson*, 331 F.3d at 1298 (internal quotation marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (internal quotation marks omitted). We review *de novo* any questions of law raised by the motion. *Montgomery*, 168 F.3d at 1289.

"We review jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." *Conroy v. Abraham Chevrolet–Tampa, Inc.*, 375 F.3d 1228, 1233 (11th Cir. 2004) (internal quotation marks omitted). If the instructions accurately reflect the law, the trial judge has "wide discretion as to the style and wording employed in the instruction." *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1115 (11th Cir. 2006). "Jury instructions are subject to harmless error review." *Fid. Interior Constr., Inc. v. Se. Carpenters Reg'l Council*, 675 F.3d 1250, 1259 (11th Cir. 2012) (internal quotation marks omitted). We will reverse and order a new trial only when we are

9

"left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1288 (11th Cir. 1998) (internal quotation marks omitted).

We review for abuse of discretion the denial of a motion for a new trial. *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1204 (11th Cir. 2020). A district court should grant a motion for new trial on evidentiary grounds only when "the verdict is against the great, and not merely the greater, weight of the evidence." *King v. Exxon Co., U.S.A.*, 618 F.2d 1111, 1116 (5th Cir. 1980). The deferential abuse-of-discretion standard "is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed." *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987).

### III. DISCUSSION

We divide our discussion in five parts. We first discuss whether the district court should have permitted the jury to consider whether MidlevelU granted Newstex an implied license. Second, we consider whether the district court erroneously instructed the jury on statutory damages. We then consider whether the district court permitted the jury to award statutory damages for ineligible works. Next, we address whether the district court erred by failing to consult the Register of Copyrights about possible fraud on her Office. Finally, we discuss

10

whether Newstex was entitled to judgment as a matter of law based on its defense of fair use.

### A. The District Court Did Not Err by Granting Judgment as a Matter of Law Against Newstex on its Implied-License Defense.

A nonexclusive license to use copyrighted material "may be granted orally, or may even be implied from conduct." *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) (internal quotation marks omitted); *see* 17 U.S.C. §§ 101, 204(a). An implied license is an affirmative defense to a claim of copyright infringement, so an alleged infringer bears the burden of proving that a copyright owner granted the alleged infringer an implied license. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010).

In *Latimer*, we described one way to create an implied license. *Id.* We held that "[a]n implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work." *Id.* The district court read this precedent to mean that Newstex could not succeed on its implied-license defense because it could not satisfy the first element of the *Latimer* test. But the district court misread *Latimer*.

Newstex argues, and we agree, that *Latimer* did not create an exclusive test. *Latimer* described the creation of an implied license in a work-for-hire relationship without addressing whether or how an implied license might be created in other

11

contexts. We have never held that the *Latimer* test provides the only avenue for proving that a copyright holder granted an implied license to an alleged infringer. And leading copyright authorities condemn "transmut[ing] [the] three [*Latimer*] factors into the only applicable test." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A][7] & n.69.6a (rev. ed. 2018); *accord* 2 William F. Patry, *Patry on Copyright* § 5:131 (2007).

Circumstances outside a work-for-hire situation may also give rise to an implied license. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 501–02 (5th Cir. 2012); *see also Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 60–64 (1st Cir. 2020); *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984); *Falcon Enters., Inc. v. Publishers Serv., Inc.*, 438 F. App'x 579, 581 (9th Cir. 2011). *But see Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 762–63 (7th Cir. 2016); *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000). Creating material at another's request is not the essence of a license; an owner's *grant of permission* to use the material is.

A license is "[a] permission . . . to commit some act that would otherwise be unlawful." *License*, *Black's Law Dictionary* (11th ed. 2019); *see* Robert W. Gomulkiewicz et al., *Licensing Intellectual Property: Law and Application* 4 (2d ed. 2011) ("A 'license' is a grant of permission."); *see generally* Christopher M. Newman, *A License Is Not a "Contract Not To Sue": Disentangling Property and*

*Contract in the Law of Copyright Licenses*, 98 Iowa L. Rev. 1101 (2013) (arguing that copyright licenses, like land licenses under common law, sound in property, and attributing the confusion that they sound only in contract to the pre-1976 Copyright Act doctrine of indivisibility). When an owner's conduct "clearly" manifests "a consent to . . . use" of copyrighted material, the owner impliedly grants a nonexclusive license. *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241 (1927); *see also License*, 2 *Bouvier's Law Dictionary* (14th ed. 1874) ("An *implied license* is one which is presumed to have been given from the acts of the party authorized to give it."). A nonexclusive license is a "mere waiver of the right to sue" for infringement. *De Forest*, 273 U.S. at 242 (internal quotation marks omitted); *see also Jacob Maxwell*, 110 F.3d at 753.

Courts have recognized permission to use copyrighted material in web-based contexts vastly different from the facts in *Latimer*. *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006); *accord Parker v. Yahoo!, Inc.*, No. 07-2757, 2008 WL 4410095, at *3–4 (E.D. Pa. Sept. 25, 2008). In *Field*, a website owner sued Google for posting archived copies of the site's pages, which included copyrighted content. *Field*, 412 F. Supp. 2d at 1109–10. Google presented evidence that it is well known within the Internet industry that websites can be coded to tell search-engine web crawlers—automated programs that "crawl" the web to locate, copy, and archive webpages for a search-engine index—not to copy

their webpages or display archived copies of the webpages on the search-engine index. *Id.* at 1110, 1112–13. Absent this affirmative instruction, a search engine like Google infers permission to copy and archive the webpages. *Id.* at 1116. Yet the plaintiff had coded his website to allow web crawlers to copy and archive all its pages, and even admitted that he knew about Google's practices. *Id.* at 1113–14. Because Google could reasonably interpret the plaintiff's conduct as the grant of a license for this use, Google succeeded on its implied-license defense. *Id.* at 1116.

*Field* recognized an industry practice where search engines using web crawlers construe permission to use material in a limited way and for a particular purpose. Christopher M. Newman, "*What Exactly Are You Implying?": The Elusive Nature of the Implied Copyright License*, 32 Cardozo Arts & Ent. L.J. 501, 529–31 (2014). In this manner, a website is like a brick-and-mortar business that "licenses the general public to enter the premises for business purposes," an entry that would otherwise constitute a trespass. Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 11:2, at 807 (2020); *see Restatement (Second) of Torts* § 330(e) (Am. Law Inst. 1965). But as in the brick-and-mortar context, a person may not infer permission beyond the customary scope of the license, such as if the person sought to enter a business through a back window instead of the front door or for a nonbusiness purpose like throwing a party.

14

Newstex argues that it could succeed on its implied-license defense as Google did in *Field*. But regardless of whether *Field* was correct, the district court did not err in rejecting this theory. *Cf.* Monika Isia Jasiewicz, Comment, *Copyright Protection in an Opt-Out World: Implied License Doctrine and News Aggregators*, 122 Yale L.J. 837, 846 (2012) (explaining that because "an opt-out scheme for gaining copyright holders' permission online represents a significant departure from the traditional framework of American copyright law, . . . . some courts have been hesitant to extend *Field*'s reach beyond the narrow search engine context"). Newstex failed to present substantial evidence that MidlevelU impliedly granted permission to use its copyrighted content in the way Newstex did. Newstex presented testimony about search-engine web crawlers and the coding standards that tell crawlers what they may copy. And it introduced evidence that the code for the MidlevelU website allowed any web crawler to copy any of its pages. But Newstex never presented evidence that *it* used a web crawler to collect content like Google does. On the contrary, Newstex presented testimony that it collected content by "grab[bing] [it] through RSS feeds." Implied permission to enter through a front door (web crawler) does not also imply permission to enter through a back window (RSS feed).

Newstex's evidence about RSS feeds fares no better. Newstex stresses that MidlevelU took affirmative steps to disseminate the full text of its content—

instead of only summaries or headlines as many blogs did—through its RSS feed without any restrictions. But Newstex failed to present evidence of an industry practice that would allow a jury to infer that disseminating content—regardless of how much—through an RSS feed without restrictions implies permission to copy and publish that content on another website. *Cf. Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 784 F. App'x 253, 255–58 (5th Cir. 2019). Newstex introduced no evidence that any other websites republished content received from an RSS feed, much less that the practice was customarily accepted. Nor did Newstex present evidence that MidlevelU knew about the practice and permitted it. *Cf. De Forest*, 273 U.S. at 241; *Baisden*, 693 F.3d at 501–02; *Jacob Maxwell*, 110 F.3d at 753.

The district court did not err by deciding as a matter of law that Newstex could not succeed on its implied-license defense. The only evidence before the jury related to personal use of RSS-distributed content. Newstex presented testimony explaining that RSS is used as an alternative to a web browser to read content: an RSS feed stores the articles that it receives from a website, and a human then reads the articles though an RSS reader. This testimony aligns with Tolbert's testimony that MidlevelU set up its RSS feed to make its content "easier for [its readers] to access." Implied permission to enter the front door to shop (read the content through an RSS reader for personal purposes) does not imply permission to enter

16

and throw a party (sell computer-generated summaries paired with iFrames showing the full-text content). Newstex failed to present evidence that would have allowed the jury to infer that MidlevelU granted an implied license to copy and publish the content of its blog.

##### B.  The District Court Did Not Err by Instructing the Jury That It Could Consider Unregistered Articles in its Calculation of Statutory Damages.

Newstex argues that the jury that should not have been allowed to consider evidence about MidlevelU articles that appeared on the Index but that MidlevelU did not register with the Copyright Office when the jury determined statutory damages. MidlevelU elected to pursue statutory damages. 17 U.S.C. § 504. Newstex insists that permitting consideration of the unregistered works circumvented the few limits on statutory damages. *See id.* § 412(2). We disagree.

The district court gave the jury our pattern instruction, which lists several factors for a jury to consider in determining the appropriate amount of statutory damages to award: "the profits [the defendant] earned because of the infringement; the revenues that [the plaintiff] lost because of the infringement; the difficulty of proving [the plaintiff's] actual damages; the circumstances of the infringement; whether [the defendant] intentionally infringed [the plaintiff's] copyright; and deterrence of future infringement." *Eleventh Circuit Pattern Jury Instructions (Civil Cases)* § 9.32 (2013); *see id.* cmt. 4 (citing *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 850 (11th Cir. 1990), and *F.W. Woolworth Co.*

17

*v. Contemp. Arts, Inc.*, 344 U.S. 228, 233 (1952)). The district court explained to the jury that it admitted evidence about the unregistered works "for the limited purpose of helping [the jury] evaluate" these factors and determine an amount of statutory damages to award.

Newstex's conduct with respect to the unregistered works was, at least, relevant to the willfulness of the infringement and the need to deter future violations. *Cable/Home Commc'n*, 902 F.2d at 851–52. We need not decide whether the unregistered works were relevant to any other factor because Newstex argues only that the jury could not consider the unregistered works *at all*. And Newstex cites no authority to support that argument.

To the extent that the instructions were overbroad, any error was harmless. *Fid. Interior Constr.*, 675 F.3d at 1259. The district court instructed the jury that it could not award damages for the unregistered works. And we presume that a jury follows its instructions. *United States v. Almanzar*, 634 F.3d 1214, 1223 (11th Cir. 2011). The completed verdict form also confirms that the jury understood it could award damages for only the registered works. The jury awarded damages for 27 infringed articles. It awarded $7,500 per article—well within the available range of $750 to $150,000 per willfully infringed work. *See* 17 U.S.C. § 504(c)(1)–(2). And it correctly multiplied those numbers to arrive at its total award. Nothing suggests the jury was misled, especially when one considers that it could have awarded

18

$750 to $30,000 per work if it found that the infringement was not willful. *See id.* § 504(c)(1). Newstex makes no argument that multiplying the bottom of the range by a factor of 10 is unreasonable for the added factor of willfulness.

Newstex also complains about the admission of evidence about these unregistered works. But it fails to explain a specific objection to any evidentiary ruling, so it has abandoned that issue. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014).

### C. The District Court Did Not Abuse its Discretion by Denying Newstex's Motion for a New Trial on the Basis of the Jury's Statutory-Damages Award.

Newstex asks for a new trial because, in its view, the jury erroneously awarded statutory damages for works that were ineligible for such damages. Statutory damages are not available for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2). Newstex challenges whether MidlevelU proved that it registered the 27 articles for which the jury awarded statutory damages within that three-month window.

We disagree with Newstex. None of its arguments merits a new trial. And the district court did not abuse its discretion in denying one.

19

A "certificate of a registration made before or within five years after first publication of the work" constitutes "prima facie evidence of the validity of the copyright *and of the facts stated in the certificate*." *Id.* § 410(c) (emphasis added). The date of publication is a "fact[] stated in the certificate." *Id.*; *see Gaste v. Kaiserman*, 863 F.2d 1061, 1064 (2d Cir. 1988). And the dates listed in the certificates are presumed to be true. *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1258 (9th Cir. 2011). Newstex bore the burden of rebutting that presumption. *Id.* And the jury could have reasonably found that Newstex failed to do so. *Gaste*, 863 F.2d at 1064.

According to Newstex, the original publication dates listed in the certificates were not necessarily accurate because Tolbert testified both that she relied on the most recent publication date when she registered the works and that MidlevelU occasionally republished blog posts. But MidlevelU needed only to provide proof of its certificates of registration, which it did. Newstex had to persuade the jury that it should not presume the dates listed in those certificates were accurate. *United Fabrics*, 630 F.3d at 1258. Yet—with two exceptions—for every article that the jury awarded statutory damages, Newstex introduced evidence that *confirmed* that the original publication date listed on the certificates was correct or that the date was within the three-month window. Newstex succeeded in proving that the listed dates for 16 articles—those listed in jury interrogatory number

20

four—were incorrect and that those articles were untimely registered, so infringement of those articles could not support statutory damages.

Newstex argues that it provided evidence that two other articles also were published earlier than the purported publication dates and over three months before registration. But Newstex waived this argument. *United States v. Phillips*, 834 F.3d 1176, 1183 (11th Cir. 2016). Newstex agreed to a verdict form that did not give the jury the option to find that those two articles were published before the three-month window. The only articles that the jury could find were ineligible for statutory damages because MidlevelU failed to timely register them were the 16 articles listed in interrogatory number four. What's more, when Newstex presented testimony and argued to both the district court and the jury about this same issue, it did not include these two articles. Newstex argued that these two articles also could not support statutory damages for the first time in its motion for a new trial.

Finally, Newstex argues that the jury could not properly assess infringement because MidlevelU failed to present evidence of the certified deposit materials—the materials it deposited with the Register of Copyrights along with its applications for registration—or a history of its revisions to its articles. Newstex never explains how the jury's supposed inability to assess infringement establishes that the articles were registered too late to support statutory damages. But, in any event, the jury could assess infringement because MidlevelU presented evidence

21

about what materials it registered. Tolbert testified that exhibits of the text and screenshots of the articles—all admitted into evidence—matched the content of the materials MidlevelU submitted to the Copyright Office. And Newstex itself presented files showing the full text of the articles as it received them. It never argued or attempted to prove that there was any discrepancy between the full text of any of the articles as shown in MidlevelU's text and screenshot exhibits or Newstex's own files. The jury's verdict is not against the great weight of the evidence, so Newstex is not entitled to a new trial. *King*, 618 F.2d at 1116.

### D. *The District Court Did Not Err by Failing to Consult with the Register of Copyrights about the Alleged Fraud on the Copyright Office.*

Newstex faults the district court for failing to consult with the Register of Copyrights about the fraud it alleged MidlevelU perpetrated on the Copyright Office, a consultation Newstex contends was required by statute. 17 U.S.C. § 411(b)(2) (providing that the court shall consult with the Register regarding the materiality of inaccurate information on a copyright-registration application "[i]n any case" in which inaccurate information described in section 411(b)(1) is alleged); *see Roberts v. Gordy*, 877 F.3d 1024, 1029 (11th Cir. 2017) (explaining that section 411(b)(1) codifies the defense of fraud on the Copyright Office). And so, Newstex says, a new trial is warranted.

To the extent that the district court committed any error on this issue, Newstex invited it. *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir.

22

2009). During trial, the district court asked Newstex about the statutory procedure for consulting the Register. Newstex asked the district court if it could bring an outline of the procedure the following morning. The district court agreed. But Newstex never followed up. So it induced the district court to proceed to a verdict and a judgment without consulting the Register. *Cf. Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1299 & n.6 (11th Cir. 2019). It may not challenge the purported error now.

Even if Newstex had not invited any error, it forfeited the issue. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). Newstex never mentioned the requirement before trial. When the parties and the district court discussed fraud on the Copyright Office, Newstex told the district court that the factual questions underlying its argument should go to the jury and then the district court could decide whether the findings were sufficient to invalidate the registrations—without any mention that the district court must first consult with the Register at any point. *Cf. Dear*, 933 F.3d at 1299. Later, when MidlevelU moved for judgment as a matter of law, Newstex again said nothing about the requirement. And Newstex did not include this issue in its motion for post-trial relief. Newstex never argued to the district court that it must consult with the Register before either it or the jury considered any issue relating to fraud on the

23

Copyright Office. So we will not consider any argument that the district court erred on that basis. *Id.*

### E. Newstex Is Not Entitled to Judgment as a Matter of Law on its Fair-Use Defense.

Newstex argues that it established that its use of MidlevelU's copyrighted articles in the Index was fair use as a matter of law. But as the district court stated when ruling on Newstex's Rule 50(a) motion, fair use is a "quintessential issue of fact" best left to the jury. Newstex fails to persuade us that no reasonable juror could have found for MidlevelU on fair use.

"From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, 'to promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (alterations adopted) (quoting U.S. Const. art. I, § 8, cl. 8)). Congress eventually codified the fair-use doctrine. 17 U.S.C. § 107; *see Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). And that codified rule governs our review.

To determine whether a particular use is fair, a factfinder considers four nonexclusive factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;

24

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The inquiry is a "flexible" one that requires weighing the four factors in the light of the facts of the case. *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1259 (11th Cir. 2014). We consider each factor in turn.

### 1.  The Purpose and Character of the Use

The first factor focuses on "(1) the extent to which the use is a 'transformative' rather than merely superseding use of the original work and (2) whether the use is for a nonprofit educational purpose, as opposed to a commercial purpose." *Id.* at 1261. Determining whether a use is transformative requires asking "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (alterations adopted) (internal quotation marks and citations omitted). Although "transformative use is not absolutely necessary for a finding of fair use," transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Id.* So "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

25

Newstex insists that the Index constituted a transformative use because it was a search engine. Whether or not the Index was a search engine, that label "is not a talismanic term that serves as an on-off switch as to fair use." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 742 (9th Cir. 2019). Instead of "resorting to labels," we consider "the reality of what is happening." *Id.* at 740. The Index had some features of a search engine, in that it "enable[d] information retrieval by helping users find information through the use of keyword queries." *Id.* at 742. But making copyrighted material searchable does not alone change the original purpose of the material. *Id.*

The jury could have reasonably found that the Index was not a transformative use based on the Index's inclusion of iFrames showing the full-text content of MidlevelU's articles. A reasonable juror could have found that the iFrames obviated any need for an Index subscriber to visit MidlevelU's website directly, so the Index superseded the use of the originals. *See id.*; *cf. Authors Guild v. Google, Inc.*, 804 F.3d 202, 206, 214–25 (2d Cir. 2015) (explaining that the Google Books database, which "tests the boundaries of fair use," provided only "snippets" of copyrighted works).

The commercial purpose of the Index also provided evidence for the jury to find that this factor did not weigh in Newstex's favor. *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Newstex does not deny this

26

commercial purpose, but instead asserts that the articles had no commercial value for MidlevelU because it made them available at no cost. But this argument confuses the inquiry, which asks whether the *alleged infringer's* use of the material was commercial. *See Cambridge Univ. Press*, 769 F.3d at 1263. And the articles served, in part, to attract potential customers to MidlevelU's revenue sources. That MidlevelU did not charge readers for access to the articles does not mean that MidlevelU would not have charged Newstex to republish them. With evidence before it that Newstex sold the Index including MidlevelU's content and that Newstex paid other content providers for full-text licenses, the jury could have reasonably found that Newstex "st[ood] to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. Because a jury could have reasonably found that the Index did not constitute a transformative use and that its purpose was commercial, this factor weighs in MidlevelU's favor.

## 2.  The Nature of the Copyrighted Work

This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Cambridge Univ. Press*, 769 F.3d at 1268 (internal quotation marks omitted). Creative works that contain "the most originality and inventiveness" are afforded "maximal

27

protection," while "it is more likely that the use of a factual or informational work will be fair use." *Id.*

Newstex argues that this factor should weigh in its favor because MidlevelU's articles were factual. To be sure, the articles are not like a fictional film that squarely falls on the creative side of the spectrum. *Cf. Stewart v. Abend*, 495 U.S. 207, 237–38 (1990). But none of the articles is a "bare factual compilation[]"on the opposite side of the spectrum either. *Campbell*, 510 U.S. at 586. The articles present advice for midlevel healthcare providers on healthcare- and career-related issues. Some are more informational; some are more creative and speak from the author's personal experience. At most, this factor is neutral. But the jury could have found that the articles were sufficiently creative to weigh against a finding of fair use. *See Cambridge Univ. Press*, 769 F.3d at 1270 ("Where [the defendant's use of the plaintiffs' academic works] contained evaluative, analytical, or subjectively descriptive material that surpasses the bare facts necessary to communicate information, or derives from the author's experiences or opinions, . . . the second factor [is] neutral, or even weigh[s] against fair use [where the works were] dominated by such material.").

### 3.  The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

To evaluate the third factor, we ask "whether [the] defendant[ has] helped [itself] overmuch of the copyrighted work in [the] light of the purpose and

character of the use." *Id.* at 1271 (internal quotation marks omitted). In conclusory fashion, Newstex says this factor weighs in favor of fair use because it "provided users with access to summaries of MidlevelU's work, full attribution to MidlevelU, and a direct link to MidlevelU's website." Newstex omits that it also provided its subscribers access to the full-text content through the iFrames. "Copying an entire work militates against a finding of fair use." *VHT*, 918 F.3d at 744 (alteration adopted) (internal quotation marks omitted). And in MidlevelU's eyes, Newstex's summaries were "short-form copies" that included "a substantial portion of each article." Even disregarding the iFrames, reasonable minds can differ as to whether Newstex used more of MidlevelU's content than necessary for the purpose and character of the Index.

4.  The Effect of the Use on the Potential Market For or Value of the Copyrighted Work

Finally, we consider "(1) the extent of the market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market." *Cambridge Univ. Press*, 769 F.3d at 1275 (alteration adopted) (internal quotation marks omitted). Market harm is "a matter of degree," and so the importance of this factor varies with the relative strength of the other factors. *Id.* (internal quotation marks omitted). We mostly concern ourselves with the adverse impact of market substitution. *Id.* "The central

29

question . . . is not whether [the defendant's] use of [the plaintiff's] works caused [the plaintiff] to lose *some* potential revenue," but instead "whether [the defendant's] use—taking into account the damage that might occur if 'everybody did it'—would cause *substantial* economic harm." *Id.* at 1276. In other words, is the marketability of the copied work materially impaired by the copying?

Because there is evidence on both sides for this factor, we cannot conclude that no reasonable juror could have found that it favored MidlevelU. Newstex asserts that MidlevelU "implicitly admitted" that the Index did not impact MidlevelU's market for blog articles because MidlevelU did not seek any injunctive relief and continued to make its articles available for free. But MidlevelU sent Newstex a cease-and-desist letter, so it did seek to halt Newstex's use of its content. And that MidlevelU still wanted its readers to access its content for free is not conclusive evidence that Newstex's use did not affect the market for MidlevelU's content.

Although MidlevelU offered no evidence that it lost readership because of the Index, *cf. id.*, Tolbert testified that she felt that the Index was a "threat" because readers might find MidlevelU's content on the Index instead of MidlevelU's website or think MidlevelU's content is low quality because of the poorly constructed abstracts on the Index. Weighing this evidence is a task left to the jury. *Cleveland*, 369 F.3d at 1193. Moreover, the jury could have reasonably found that

30

because of the Index's iFrames, the Index could serve as a market substitute for the articles and so substantially impact the market for them.

In sum, reasonable minds could differ as to all four factors and the weight to afford each factor, so we cannot overturn the verdict. The jury had before it all the evidence that Newstex points to now and heard its arguments. Because the jury could have reasonably found that Newstex did not establish its fair-use defense, Newstex is not entitled to judgment as a matter of law for any article.

## IV. CONCLUSION

We **AFFIRM** the judgment against Newstex.

31